**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION**

| | |
|---|---|
| BARBARA JOHNSON, | ) |
| | ) |
| and | ) |
| | ) |
| NICOLE PRICE, | ) |
| | ) Case No.: |
| and | ) |
| | ) |
| NARENE CROSBY, | ) |
| | ) |
| Plaintiffs, | ) |
| vs. | ) |
| | ) |
| GOVERNOR MICHAEL L. PARSON, | ) |
| | ) |
| and | ) |
| | ) |
| ATTORNEY GENERAL ANDREW BAILEY, | ) |
| | ) |
| and | ) |
| | ) |
| SECRETARY OF STATE JAY ASHCROFT, | ) |
| | ) |
| and | ) |
| | ) |
| KANSAS CITY, MISSOURI BOARD OF POLICE COMMISSIONERS, comprised of its Members as follows: | ) ) ) |
| | ) |
| CATHY DEAN | ) |
| Member and President | ) |
| | ) |
| DAWN CRAMER | ) |
| Member and Vice President | ) |
| | ) |
| TOM WHITTAKER | ) |
| Member | ) |
| | ) |
| MARK TOLBERT | ) |
| Member | ) |
| | ) |
| MAYOR QUINTON LUCAS, | ) |

| Member | ) |
| | ) |
| Defendants. | ) |

## COMPLAINT

COME NOW Plaintiffs Barbara Johnson, Nicole Price, and Narene Crosby ("Plaintiffs"), by and through their counsel of record Spencer J. Webster of Webster Law, LLC, and for their causes of action against Defendants Governor Michael L. Parson ("Defendant Parson"), Attorney General Andrew Bailey ("Defendant Bailey"), the Secretary of State Jay Ashcroft ("Defendant Ashcroft"), and the Kansas City, Missouri Board of Police Commissioners, by and through its members Cathy Dean, Dawn Cramer, Tom Whittaker, Mark Tolbert, and Mayor Quinton Lucas ("Defendant KCPD") state the following:

## INTRODUCTION

1. Plaintiffs bring this action to challenge the constitutionality of the State of Missouri's statutes under Chapter 84 – Police Departments in St. Louis and Kansas City[1], specifically the statutes applicable to Kansas City, Missouri, which are unconstitutional and have been since each respective statute was enacted.

2. In violation of the Fourteenth Amendment, these laws target Kansas City's Black residents on the basis of race for a separate and unequal policing structure to which no other residents of the State are subjected. Moreover, what is now Chapter 84 was first passed in 1861 in order to take control of the St. Louis Police Department, and its munition, in an attempt to aid the Confederacy in the Civil War.

3. Chapter 84 sets forth the current policing structure for Kansas City, Missouri, which establishes a board of police commissioners, consisting of four commissioners appointed by the

---

[1] Notably, Chapter 84 as it relates to St. Louis was repealed by initiative petition in 2012.

governor along with the mayor—the very same structure established in 1861. Outside of the mayor of Kansas City, the commissioners serve at the pleasure of the governor.

4. Chapter 84 applies to cities with more than 300,000 citizens and less than 700,000 citizens—only St. Louis and Kansas City fit into that window, and St. Louis and Kansas City have the highest population of Black residents in Missouri.

5. Chapter 84 is designed to create a system of separate but unequal law enforcement, one that continues discriminatory policing and refuses to implement any type of accountability or discipline.

6. These statutes unlawfully erode the political power of Kansas City residents, which has the largest population of Black residents in Missouri, and their governmental institutions in the following manners:

   a. Singling out Kansas City and implementing a form of State policing free from electoral accountability;

   b. Not allowing Kansas City residents to voice how it spends its tax dollars as the State mandates the amount of money Kansas City gives to the police department and the State is in complete control of how the department spends those tax dollars;

   c. Not allowing Kansas City to have a say in the form and manner of policing its residents are subject to; and

   d. Denying Kansas City the ability to change operations and/or policies that have been shown to result in discriminatory policing.

7. Taken together, and as more fully explained below, these provisions strip Kansas City residents, including Plaintiffs, of their rights to enjoy the full protections of the law and to

exercise the same civil liberties as other Missouri citizens.

## PARTIES

8. Plaintiff Dr. Barbara Johnson is a resident of and registered voter in Kansas City, Missouri. As a voter, Dr. Johnson considers law enforcement policies when voting for mayor or other local elected offices. As a resident of Kansas City, Dr. Johnson is subject to policing by the Kansas City Police Department ("KCPD").

9. Plaintiff Dr. Nicole Price is a resident of and registered voter in Kansas City, Missouri. As a voter, Dr. Price considers law enforcement policies when voting for mayor or other local elected offices. As a resident of Kansas City, Dr. Price is subject to policing by the KCPD.

10. Plaintiff Narene Crosby is a resident of and registered voter in Lee's Summit, Missouri. Ms. Crosby's only son, Ryan Stokes, was killed by a KCPD officer—he was unarmed, did not force a standoff, and was not threatening officers when he was shot. Ms. Crosby moved out of Kansas City after her son was killed by KCPD. Ms. Crosby's granddaughter, Ryan's daughter, still lives in Kansas City and Ms. Crosby regularly visits her granddaughter. Additionally, Ms. Crosby attends church and regularly does business in Kansas City, thus she is subject to policing by the KCPD.

11. Defendant Parson is the Governor of the State of Missouri. As Governor, he is responsible for the implementation of Chapter 84 and ensuring "that the laws are distributed and faithfully executed" and he is "a conservator of the peace throughout the state." MO Const. art IV § 2. Defendant Parson is also responsible for appointing and supervisoring the Board of Police Commissioners of Kansas City. RSMo. § 84.350. Governor Parsons' official residence and principal place of business are in Jefferson City, Cole County, Missouri. He is being sued solely in his official capacity.

12. Defendant Andrew Bailey is the Attorney General of Missouri. The Attorney General is Missouri's chief legal officer and is responsible for defendant challenges to the validity of state laws. Defendant Bailey's official residence and principal place of business are in Jefferson City, Cole County, Missouri. He is being sued solely in his official capacity.

13. Defendant Jay Ashcroft is the Secretary of State of Missouri. The Secretary of State is the custodian of the laws of the State of Missouri. Defendant Ashcroft's official residence and principal place of business are in Jefferson City, Cole County, Missouri. He is being sued solely in his official capacity.

14. Defendant Board of Police Commissioners of Kansas City is an agency of the State of Missouri established under RSMo. §§ 84.350, *et seq*.

15. The Board is comprised of Commissioners Cathy Dean, Dawn Cramer, Tom Whittaker, Mark Tolbert, and Mayor Quinton Lucas, named here in their official capacities. Defendant Board of Police Commissioners of Kansas City's official residence and principal place of business are in Kansas City, Jackson County, Missouri.

## JURISDICTION AND VENUE

16. The action arises under the Fourteenth Amendment of the United States Constitution, 42 U.S.C. § 1983 and Title VI of the Civil Rights Act of 1964. This Court therefore has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343.

17. In addition, this Court has jurisdiction to grant declaratory relief under 28 U.S.C. §§ 2201 and 2202 and Rule 57 of the Federal Rules of Civil Procedure.

18. Venue is proper in the Western District of Missouri because a substantial part of the events giving rise to the claims have occurred or will occur within this District and because all individual Plaintiffs, and Defendants State of Missouri and Kansas City, Missouri Board of Police

Commissioners are located in this District. 28 U.S.C. § 1391(b).

## FACTUAL ALLEGATIONS

19. State control of Kansas City's police department began in 1861, as Governor Claiborne F. Jackson, who favored seceding and joining the Confederacy, feared the St. Louis Metropolitan Police Department ("SLMPD") would turn against the Confederacy.

20. In order to make sure SLMPD did not turn against the Confederacy, Jackson and the Missouri legislature created and passed legislation establishing the "Police Commissioners of the city of St. Louis" which consisted of "four commissioners, as is hereinafter provided, together with the Mayor[.]" Laws of Missouri, 21st General Assembly, Regular Session, 1861, 446; State Documents Collections, Missouri State Archives, Jefferson City.

21. The legislation also provided the "Governor of the State of Missouri, by and with the advice and consent of the Senate, shall, without unnecessary delay, appoint the four commissioners[.]" *Id*.

22. Governor Jackson signed the measure into law on March 27, 1861.

23. Upon the measure becoming law, Jackson swiftly appointed four secessionists as police commissioners, including Basil W. Duke, the commander of the "Minutemen," a white supremacist militia. Duke later became a Confederate general.

24. Duke later stated, "[t]he police bill was in reality a war measure, adopted to enable our people to control St. Louis … I knew the meaning of the measure … and tried to carry it into action."[2]

25. In fact, at the time, The New York Times published an article titled "Important Movement in St. Louis," which stated:

---

[2] Josh Merchant, *State Control of Kansas City's Police has Roots in the Civil War*, THE BEACON, Dec. 20, 2022, https://kcbeacon.org/stories/2022/12/20/kcpd-state-local-control-history-police-board/.

"The Board of Police Commissioners for the City of St. Louis was established by the late rebel Legislature of Missouri, and Gov. JACKSON was given the appointment of its members. The object was to get the City Government of St. Louis out of the hands of the Unionists, and place it in those friendly to the rebels."[3]

I. **Chapter 84 was Motivated by a Discriminatory Purpose and Intentionally Discriminates Against Black Residents in Kansas City**

26. The law establishing the Police Commissioners for the city of St. Louis was created specifically for the treasonous and discriminatory purposes of joining the Confederacy to fight against ending slavery.[4]

27. The legislature passed the police bill with the direct knowledge and awareness that the law would be used to further discriminate against Black people by keeping them enslaved and considered property.

28. The legislature did not pass the police bill for any legitimate purpose; the legislature passed the police bill to commit treason, to keep Black people captive, and to deny Black people basic human rights and dignities.

29. After the Civil War ended in 1865, the police bill was again codified in 1899 in what were Missouri's first official statutes.

30. In the codification in 1899, the legislature expanded the board of police commissioners to apply to "all cities of this state that now have or may hereafter attain a population of three hundred thousand inhabitants or over[.]" Laws of Missouri, 40th General Assembly, Regular Session, 1899, 1452; State Documents Collections, Missouri State Archives, Jefferson City.

31. The police bill was again revised in 1909, 1919 and 1929.

32. In its current version, Chapter 84 is cited back to the 1909 law; and the 1909 law

---

[3] *Important Movement in St. Louis*, THE NEW YORK TIMES, Aug. 15, 1861.
[4] *Id*.

can be cited back to 1899.

33. In fact, on the Revisor of Missouri website, RSMo. § 84.350, establishing Kansas City's Board, displays its previous versions:

(RSMo 1939 § 7645, A.L. 1943 p. 727, A.L. 1947 V. I p. 405, A.L. 1958 2d Ex. Sess. p. 152, A.L. 1993 S.B. 376, A.L. 1995 H.B. 574)

Prior revisions: 1929 § 7502; 1919 § 8913; 1909 § 9765

34. Thus, Chapter 84, at its inception, was created for the discriminatory purpose and intent of seceding from the Union and joining the Confederacy in an attempt to fight to keep Black people enslaved. Furthermore, Chapter 84 was intended to remove the will of the voters in the establishment and operation of largely minority-populated large cities, so that the free will of voters in Missouri who were anti-confederate could not participate in their own local governance by way of policing.

35. The current law establishing the Board of Police Commissioners of Kansas City was originally passed as an effort to keep slavery legal and Black people in chains. Its roots firmly planted in this established pattern of discriminatory policing cannot be separated from its continued effect of discriminatory policing today, as those patterns and practices can be borne out in today's statistics of policing, which are palpably discriminatory against Black people.[5]

36. Lucky for all of us, the Union was able to keep Governor Jackson and the Police Commissioners of the city of St. Louis from joining rebel forces.

37. Beyond the fact Chapter 84 was established for a discriminatory purpose, in its current form, it was tailored specifically to only apply to St. Louis and Kansas City—the two cities in Missouri with the largest population of Black residents. RSMo. §§ 84.020 and 84.350.

---

[5] See *supra* at note 3.

38. Thus, the war measure which sought to keep Black people enslaved is now the law that establishes state police departments to police the cities with the largest Black populations in Missouri.

39. The statutes do not set forth objective criteria for when the State will assume control of a political subdivision's police, instead the statutes single out two cities with no basis for the assumed control. No legitimate state budgetary, financial or operational reasons exists for the establishment of state policing of local police departments. None existed in 1861 and none exist today, particularly against the backdrop of statistical proof that the state-run police department of Kansas City objectively discriminates against Black people.

**II. Chapter 84 Intentionally Deprives Residents of Kansas City Equal Protection of the Laws**

40. Chapter 84 violates the Fourteenth Amendment by denying Plaintiffs equal protection of the law. Kansas City is the only city in the State that is subject to Chapter 84 and the only city in the State for which the State controls its law enforcement. No other locality in Missouri has been singled out for a similar law enforcement scheme. Kansas City's residents alone are deprived of local, democratic control over the vital governmental function of policing.

41. Kansas City's residents can vote directly for their sheriff, but they have no such power with respect to influencing who is selected as a commissioner nor who the commissioners select as the Police Chief. The Chief of KCPD is appointed and supervised by the Board of Police Commissioners—the Commissioners, who are, in turn, appointed and supervised by the Governor of the State of Missouri. Kansas City's elected mayor, elected sheriff, and the elected county executive are all Black; yet the Board of Police Commissioners has only one appointed Black commissioner and there has never been a commissioner appointed from the district of Kansas City with the most calls to the police—a largely Black community.

42. KCPD are effectively unaccountable to those whom they police. Kansas City voters make up most of the electorate in Jackson County that elects the Jackson County Sheriff. As residents of a city that comprises about 8% of the overall State population, however, Kansas City residents have almost no say in elections or appointments to statewide offices.

43. Missouri's racially polarized voting further limits Kansas City's residents' ability to affect statewide elections. Black voters in Kansas City vote largely for different candidates for statewide office than their white counterparts throughout the State. Missouri has not elected a Black official to statewide office since Reconstruction, and statewide officials often do not need to appeal to Black voters in Kansas City to get elected.

44. Rather than real electoral control, Chapter 84 establishes that the Board of Police Commissioners have "exclusive management and control of" the KCPD. RSMo. § 84.460.

45. The lack of accountability of KCPD to Kansas City's residents extends to specific policing policies. The Board of Police Commissioners rarely, if ever, passes its own policies. The Board of Police Commissioners merely acts as a rubber stamp for the policies KCPD puts before it as the mayor is the only commissioner to vote no on such policies.

46. Additionally, Kansas City is required to hand over 25% of its general revenue to the Board of Police Commissioners and local politicians, least of all the mayor or city council, do not have any say or authority over how that money is spent.

47. Even when KCPD has *defacto* policies, or unwritten policies, policies that clearly violate the law, it is still not held accountable. For example, KCPD officers were told, when approaching minority citizens to, "approach every car with the mindset to be ready to kill everybody in the car."[6] There have been multiple instances of KCPD instituting an "unspoken

---

[6] Bill Lukitsch, KCPD Traffic Cop was Told to Target Minority Residents to Meet Ticket Quotas: Lawsuit, THE KANSAS CITY STAR, Mar. 23, 2023 at 9:50 AM,

10
Case 4:24-cv-00174-BP   Document 1   Filed 03/11/24   Page 10 of 18

policy" which precludes them from entering private property without a warrant, even when a crime is actively being committed. Further, from 2013 to 2021, KCPD had 2,637 civilian complaints, only 3% of which were found in favor of civilians (294 use of force complaints, 1% ruled in favor of civilians; 61 reported complaints of police discrimination, 0% ruled in favor of civilians). Further still, KCPD uses deadly force more than 95% of police departments in the U.S. Police Scorecard, https://policescorecard.org/mo/police-department/kansas-city.

48. Black residents in Kansas City are 2.2 times more likely to be arrested for low level, non-violent offenses than their white counterparts. *Id*. KCPD arrests and kills black people at a higher rate than any other race. *Id*. Based on 2022 population estimates by the United States Census Bureau, Kansas City has the most Black residents out of any city in Missouri, followed by St. Louis. Across the State, less than 12% of the population is Black; more than 19% of Missouri's total Black population lives in Kansas City alone. But no other jurisdiction, municipality, or county—even those with similar crime rates—is subject to State policing.

### III. KCPD's Policing of Black Residents in Kansas City Intentionally Discriminates Against Black Residents and Deprives them of the Equal Protection of Laws

49. The State's control over KCPD has resulted in blatantly discriminatory policing by its own data.

50. KCPD's Vehicle Stops Report in 2022 shows that despite white residents representing about 63% (250,109) of Kansas City's population and Black residents representing about 25% (101,137) of Kansas City's population, Black individuals had higher rates in every category except for contraband hit rate.

51. Black individuals were stopped at a rate of 8.26% and white individuals were stopped at a rate of 5.54%; Black residents were stopped at a rate of 5.02% and white residents

---

https://www.kansascity.com/news/local/crime/article273437100.html.

were stopped at a rate of 2.01%; Black individuals were searched at a rate of 3.11% and white individuals were searched at a rate of 1.57%; Black individuals were arrested at a rate of 5.43% and white individuals were arrested at a rate of 2.44%; Black individuals were cited at a rate of 77.46% and white individuals were cited at a rate of 76.09%; the contraband hit rate on Black individuals was 37.69% and the contraband hit rate on white individuals was 39.63%.

52. KCPD stopped a total of 11,213 residents, 5,039 were white residents and 5,077 were black residents.

53. KCPD searched 512 individuals, 217 were white and 260 were Black; KCPD found contraband on 192 individuals, 86 were white and 98 were Black; KCPD arrested 892 people, 338 were white and 453 were Black; KCPD took no action after a stop in 1,250 situations, 826 of those individuals for whom no action was taken were white, 299 were Black.

54. Out of the searches KCPD conducted that were pursuant to probable cause, KCPD searched inventory a total of 230 times—white individuals inventory was search 105 times while Black individuals inventory was searched 109 times; 189 people were searched based on drug and/or alcohol odor—63 were white and 110 were Black; 286 people were searched incident to arrest—126 were white, 137 were black; 46 people were searched because KCPD saw contraband in plain view—16 were white, 29 were Black; 11 people were searched because KCPD has reasonable suspicion the individual had a weapon—3 were white, 8 were Black.

55. KCPD conducted 470 searches that lasted between 0-15 minutes—of those searches 196 people were white, 241 were Black; 35 searches lasted between 16-30 minutes—14 were white, 19 were Black.

56. KCPD found drugs and/or alcohol contraband on 174 individuals—76 were white, 90 were Black; KCPD found currency contraband on 10 individuals, all were Black; KCPD found

weapon contraband on 64 individuals—21 were white, 42 were Black; KCPD found stolen property on 15 individuals—5 were white, 9 were Black.

57. Out of the searches KCPD conducted: 354 individuals were arrested for an outstanding warrant—121 were white and 213 were Black; 152 individuals were arrested for a drug violation—77 were white and 67 were Black; 75 individuals were arrested for resisting arrest—23 were white and 47 were Black; 188 individuals were arrested for traffic violations—73 were white and 97 were Black; 421 individuals were arrested for DWI/BAC—153 were white and 195 were Black.

58. What is emblematic of KCPD's discriminatory behavior is—white individuals were found to have contraband at a rate higher than Black individuals, yet because of the substantial differential in stops and searches (notwithstanding white people make up about 40% more of the population) more Black individuals were found with contraband.

59. Based on the 2022 Vehicle Stops Report, if white individuals were stopped at the same rate as Black individuals (8.26%) then about 20,659 white individuals would have been stopped; if 20,695 white individuals would have been searched at the same rate as Black individuals (3.11%) then 642 white individuals would have been searched; in keeping the same contraband hit rate for white individuals (39.63%), if the 642 white individuals were searched then 253 would have been found to have contraband rather than the 86 that were actually found to have contraband (98 Black individuals were found with contraband).

60. Based on the 2021 Vehicle Stops Report, if white individuals were stopped at the same rate as Black individuals (13.35%) then about 30,588 white individuals would have been stopped; if 30,588 white individuals would have been searched at the same rate as Black individuals (1.9%) then 581 white individuals would have been searched; in keeping the same

contraband hit rate for white individuals (34.69%), if the 581 white individuals were searched then 202 would have been found to have contraband rather than the 85 that were actually found to have contraband (90 Black individuals were found with contraband).

61. Based on the 2020 Vehicle Stops Report, if white individuals were stopped at the same rate as Black individuals (19.5%) then about 44,021 white individuals would have been stopped; if 44,021 white individuals would have been searched at the same rate as Black individuals (1.65%) then 726 white individuals would have been searched; in keeping the same contraband hit rate for white individuals (57.59%), if the 726 white individuals were searched then 418 would have been found to have contraband rather than the 110 that were actually found to have contraband (152 Black individuals were found with contraband).

62. This pattern of differential policing is not new as the 2015 Vehicle Stops Reports shows that KCPD made 112,028 total stops, 59,820 were white individuals and 46,392 were Black individuals; KCPD searched white individuals at a rate of 1.34% and Black individuals at a rate of 4.05%, yet white individuals' contraband hit rate was higher than Black individuals.

63. The 2010 Vehicle Stops Reports shows that KCPD made 104,789 total stops, 57,258 were white individuals and 39,580 were Black individuals; KCPD searched white individuals at a rate of 4.28% and Black individuals at a rate of 11.46%, yet white individuals' contraband hit rate was higher than Black individuals.

64. The 2000 Vehicle Stops Reports shows that KCPD made 27,457 total stops, 16,563 were white individuals and 8,879 were Black individuals; KCPD searched white individuals at a rate of 3.09% and Black individuals at a rate of 11.86%.

## CLAIMS FOR RELIEF

### COUNT I
### 42 U.S.C. § 1983
*Chapter 84 Intentionally Discriminates Against the Black Residents of Kansas City, including Plaintiffs, on the Basis of Race in Violation of the Equal Protection Clause of the Fourteenth Amendment of the U.S. Constitution as it was Motivated by a Discriminatory Purpose or Intent*

65. Plaintiffs incorporate the foregoing paragraphs as if fully set forth herein.

66. The Equal Protection Clause of the Fourteenth Amendment prohibits the State of Missouri from "deny[ing] to any person within its jurisdiction the equal protection of the laws."

67. Chapter 84 was passed and enacted with a discriminatory purpose and intent as it sought to keep Black people enslaved. As adopted, it was unconstitutional. As implemented today, its discriminatory effect still remains unconstitutional.

68. Chapter 84 singles out the largest Black population within the State of Missouri for policing in an unparalled, unaccountable, and overly intrusive manner under the authority of the State.

69. Chapter 84 takes democratic control away from Kansas City's residents and Kansas City's Black-elected officials, exposing them to a State-appointed police force that has already proven itself unable to safely and fairly serve Kansas City's Black population.

70. Plaintiffs have no adequate remedy at law other than the judicial relief sought in this case. A failure to enjoin the enforcement of Chapter 84 will immediately irreparably harm Plaintiffs and the more than 130,000 Black residents of Kansas City who will be subjected to disparate policing because of their race.

# COUNT II
## 42 U.S.C. § 1983
### *Chapter 84 Violates Title VI of the Civil Rights Act by Intentionally Discriminating Against Black Residents of Kansas City, Including Plaintiffs*

71. Plaintiffs incorporate the foregoing paragraphs as if fully set forth herein.

72. Title VI of the Civil Rights Act states that no person shall "on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity[.]"

73. Defendants have accepted financial assistance, and continue to accept financial assistance, from the federal government subjecting them to the requirements under Title VI.

74. Defendants have engaged in law enforcement practices with the intent to discriminate against Black individuals on the basis of race, color, or national origin.

75. Defendants' enforcement of Chapter 84 intentionally discriminates against Black individuals, including Plaintiffs, as described above.

76. Defendants policing of Black residents and Black individuals in Kansas City, including Plaintiffs, has, and continues today to, intentionally discriminate against Black residents and Black individuals, including Plaintiffs, as they are subjected to differential and over policing which their white counterparts are not.

77. Defendants' misconduct, as alleged above, constitutes intentional discrimination based on race and/or color in violation of Title VI.

78. Chapter 84 singles out the largest Black population within the State of Missouri for policing in an unparalleled, unaccountable, and overly intrusive manner under the authority of the State.

79. Chapter 84 takes democratic control away from Kansas City's residents and Kansas City's Black-elected officials, exposing them to a State-appointed police force that has already

16
Case 4:24-cv-00174-BP   Document 1   Filed 03/11/24   Page 16 of 18

proven itself unable to safely and fairly serve Kansas City's Black population.

80. Plaintiffs have no adequate remedy at law other than the judicial relief sought in this case. A failure to enjoin the enforcement of Chapter 84 will immediately irreparably harm Plaintiffs and the more than 130,000 Black residents of Kansas City who will be subjected to disparate policing because of their race.

81. WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in favor of Plaintiffs and against Defendants, as follows:

(a) Declare that Chapter 84 intentionally discriminates against Kansas City's residents, including Plaintiffs, on the basis of race;

(b) Declare that Defendants actions constitutes intentional discrimination in violation of the Fourteenth Amendment and Title VI.

(c) Preliminarily and permanently enjoin the Defendants authority to police Kansas City, Missouri;

(d) Enjoin Defendants, its officers, agents and employees from engaging in any of the predicate discriminatory acts forming the basis of Plaintiffs' claims in this lawsuit;

(e) Award Plaintiffs their attorneys' fees and costs incurred in bringing this action, including attorneys' fees and costs under 42 U.S.C. § 1988(b) for successful 42 U.S.C. § 1983 claims against State officials;

(f) Retain jurisdiction to render any and all further orders that this Court may enter; and

(g) Grant such other and further relief as this Court deems just and proper.

**PLAINTIFF'S DEMAND FOR JURY TRIAL**

Plaintiff hereby requests and demands a trial by jury on all issues so triable.

## DESIGNATED PLACE OF TRIAL

Plaintiff, by and through counsel, hereby designates the United States District Court for the Western District of Missouri at Kansas City as the place of trial.

Respectfully submitted,

**WEBSTER LAW, LLC**

By: */s/ Spencer J. Webster*
Spencer J. Webster #70728
712 Broadway Blvd., Suite 100
Kansas City, Missouri 64105
Telephone: 816.629.6052
swebster@sjwebsterlaw.com